**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No.  19-190-12** |
| | ) | |
| **CURTIS SAXTON-SMITH** | ) | |

<u>**FINDINGS OF FACT and CONCLUSIONS OF LAW**</u>

Defendant Curtis Saxton-Smith, along with twelve other defendants, is charged in a Superseding Indictment with one count of conspiracy to distribute 1 kilogram or more of heroin, 280 grams or more of crack cocaine, 100 grams or more of acetyl fentanyl and valeyrl fentanyl, and 400 grams or more of fentanyl, in violation of 21 U.S.C. § 846.  ECF No. 33.  In November 2019, Mr. Saxton-Smith was arrested and charged in the Superseding Indictment and made his initial appearance on November 20, 2019.  ECF No. 75.  Over a year earlier, on September 26, 2018, Mr. Saxton-Smith was a passenger in a vehicle, traveling eastbound on Interstate 76, which was stopped by Pennsylvania State Police Trooper Zachary Del Sordo. During the course of the traffic stop, Trooper Del Sordo was joined by Trooper Ryan Marmo of the Pennsylvania State Police and a search of the vehicle was conducted.  During the search, Trooper Del Sordo, discovered a hidden compartment in the vehicle containing $16,200 in United States currency.

Presently before the Court is Defendant's Motion to Suppress, in which he seeks to suppress the United States currency as well any identification of Mr. Saxton-Smith as an occupant of the vehicle.  ECF No. 439.  The government filed a Response.  ECF No. 477. The Court issued an Opinion and Order denying the Motion to Suppress after finding that an evidentiary hearing was not necessary.  Op. and Order, Aug. 19, 2020, ECF No. 517.  At the

time of the issuance of the Opinion and Order, the video and audio recording of the traffic

stop had not been viewed by counsel.  Once counsel for Mr. Saxton-Smith had an opportunity

to review the recording, he filed a Motion for Reconsideration of Order Denying Motion to

Suppress.  ECF No. 539.  The government agreed with defense counsel that the Court should

vacate its prior Order and schedule an evidentiary hearing.  ECF No. 551.  Accordingly, the

Court granted the Motion to Reconsider, vacated its Opinion and Order, and a video

evidentiary hearing was held on October 21, 2020.  ECF No. 552.  At the hearing, the

government presented the testimony of Trooper Zachary D. Del Sordo of the Pennsylvania

State Police.  ECF No. 568.  Thereafter, the parties filed Proposed Findings of Fact and

Conclusions of Law.  ECF Nos. 603 & 604.  Defense counsel also filed a Supplemental

Proposed Finding of Fact to correct one of his proposals.  ECF No. 607.  After consideration

of the pleadings, exhibits, the dash cam video, and testimony offered at the hearing, and for

the reasons that follow, Defendant's Motion will be denied.

## FINDINGS OF FACT

1.      Trooper Zachary D. Del Sordo has been employed by the Pennsylvania State

Police since 2014. Tr. Supp. Hrg, Oct. 21, 2020, at 4, ECF No. 568.

2.      He is currently a member of a criminal interdiction unit called the Troop A

Community Enforcement Team (TACET).  Tr. 4-5.

3.      He testified that he had been a member of TACET for approximately three

years, or since sometime in 2017.  Tr. 23.

3.      Trooper Del Sordo has undergone over 40 hours of training with the Safe

Highways Initiative through Effective Law Enforcement and Detection (SHIELD).  Tr. 5.

2

4.      SHIELD training provides criminal interdiction training specifically to address narcotics trafficking on highways.  Tr. 5.

5.      SHIELD training is conducted by the Pennsylvania State Police and includes both classroom learning and hands-on learning with aftermarket hidden compartments.  Tr. 26.

6.      Trooper Del Sordo underwent SHIELD training prior to being named a member of TACET.  Tr. 26.

7.      Trooper Del Sordo's SHIELD training occurred prior to the date of the traffic stop on September 26, 2018.

8.      Defense counsel questioned Trooper Del Sordo regarding his testimony in another federal criminal case in this District involving an aftermarket hidden compartment. United States v. Gonzalez, Cr. No. 19-214, W.D. Pa; Tr. Supp. Hrg, Nov. 13, 2019, ECF No. 41.

9.      During his testimony, offered on November 13, 2019, Trooper Del Sordo testified that he underwent SHIELD training approximately two years prior to the May 2019 traffic stop at issue in that case, or approximately in May 2017.  Gonzalez, Cr. No. 19-214, Tr. Supp. Hrg, Nov. 13, 2019, at 19-20.

10.     Trooper Del Sordo has also undergone training concerning deceptive behavior, aftermarket hidden compartments, and other criminal interdiction trainings.  Tr. 5.

11.     He has been involved in hundreds of traffic stops in which narcotics and the proceeds from drug activity were seized.  Tr. 5-6.

12.     With respect to traffic stops or searches of vehicles that involved hidden compartments, Trooper Del Sordo has personally been involved in over a dozen such cases. Tr. 6.  Trooper Del Sordo has discovered contraband in every hidden compartment he personally searched, except for two.  Tr. 6.

13.     Trooper Del Sordo testified that he has seen over 50 hidden compartments.  Tr. 6.

14.     He did not know the exact number of hidden compartments he had personally been involved with prior to the traffic stop in this case but stated that he had personally seized aftermarket hidden compartments prior to the September 26, 2018 traffic stop.  Tr. 50-51.

15.     Trooper Del Sordo testified that, as of November 13, 2019, he had been involved in eight aftermarket hidden compartment cases.  Gonzalez, Cr. No. 19-214, Tr. Supp. Hrg, Nov. 13, 2019, at 6.

16.     Trooper Del Sordo further explained that he had observed at least eight to ten hidden compartments in person during his training.  Tr. 51.  I

17.     In addition, he testified that he had been a part of traffic stops with other TACET members and troopers in which said law enforcement had seized hidden compartments.  Tr. 51.

18.     In Trooper Del Sordo's experience and training, hidden compartments are used for one thing and one thing only, to conceal illegal contraband.  Tr. 6, 50.

19.     On September 26, 2018, Trooper Del Sordo was monitoring traffic along Interstate 76 when he observed a silver GMC Terrain SUV traveling in the left-hand passing

lane in violation of 75 Pa. Cons. Stat. § 3313(d)(1).  Tr. 9-10; Pennsylvania State Police

Incident Report, Sept. 26, 2018, Ex. A to Gov't Resp., ECF No. 477-1.

20.     Section 3313(d)(1) of Title 75 requires that all vehicles on highways such as

Interstate 76 must travel in the right-hand lane unless a specified permitted condition applies.

75 Pa. Cons. Stat. § 3313(d)(1).

21.     After following the vehicle for approximately a mile and a half, during which

time the vehicle remained in the left-hand lane despite having ample opportunity to move to

the right-hand lane, Trooper Del Sordo conducted a traffic stop.  Tr. 10.

22.     The traffic stop began at approximately 11:24 a.m. and was recorded on both

video and audio recording devices.  Sept. 26, 2018 Incident R. 1; Dash Cam Video.

23.     The Dash Cam Video captured slightly over one-hour of the traffic stop.  Tr. 7-

8.

24.     When the recording starts, the video shows that the vehicle is in the right-hand

lane.  Tr. 10.

25.     Trooper Del Sordo explained that the reason the vehicle does not appear in the

left-hand lane when the video starts is because he did not conduct the stop until after the

vehicle had traveled a little over one mile in the right-hand lane.  Tr. 10-11.

26.     Upon contact with the occupants, driver Duane Cash and passenger Mr.

Saxton-Smith, Trooper Del Sordo noticed an overwhelming odor of marijuana coming from

the vehicle.  Tr. 7, 11; September 26, 2018 Incident R. 4.

27.     Trooper Del Sordo also noted that there was a single key in the ignition with no

other keys attached.  Tr. 11-12; September 26, 2018 Incident R. 5.

28.     In the Incident Report, Trooper Del Sordo reported that, based on his training and experience, drug traffickers commonly use a single key to facilitate use of the vehicle by other members of the organization, whereas the public in general usually attach house keys. September 26, 2018 Incident R. 5.

29.     At the hearing, Trooper Del Sordo testified similarly that, "in vehicles that are outfitted with an aftermarket hidden compartment, they tend to have a single key. These vehicles are used as a lead vehicle with the drug trafficking station.  They frequently change hands as a rental vehicle . . . .  Commonly, on legitimate travelers' key rings, you'll see other keys for their home and other sorts of things."  Tr. 12.

30.     Upon querying the vehicle's license plate through the National Crime Information Center, Trooper Del Sordo discovered that the vehicle was registered to an owner in Philadelphia.  Tr. 12-13; September 26, 2018 Incident R. 4.

31.     With respect to Mr. Cash not being the owner of the vehicle, Trooper Del Sordo stated that in his training and experience "it is very common for these vehicles that are outfitted with aftermarket hidden compartments to be driven by a third party. . . . to distance themselves from the vehicle and anything that -- any illegal contraband that would be contained in the compartment."  Tr. 13.

32.     Trooper Del Sordo also discovered that the vehicle had a reconstructed vehicle title. Tr. 17; September 26, 2018 Incident R. 5.

33.     In Pennsylvania, a "Reconstructed Vehicle" is defined as a "vehicle, . . ., for which a certificate of salvage was issued and is thereafter restored to operating condition to meet the vehicle equipment and inspection standards." [1]

34.     In Trooper Del Sordo's training and experience, vehicles with reconstructed titles are often used to install after-market hidden compartments.  September 26, 2018 Incident R. 5.

35.     Trooper Del Sordo testified that such "vehicles are usually rebuilt, and the [after-market hidden] compartments are placed in them at that point."  Tr. 17.

36.     The vehicle's license plate was also recently registered, indicating to Trooper Del Sordo that the vehicle was possibly being used in rotation with other vehicles as a means for a drug trafficker to avoid detection by police and rival drug traffickers.  Tr. 17; September 26, 2018 Incident R. 5.

37.     He explained that "drug trafficking organizations are frequently changing registration plates. . . . in order to avoid surveillance from other drug trafficking organizations in fear of being robbed. . . . [and] to avoid law enforcement detection and potentially having the vehicles tracked by law enforcement."  Tr. 18.

38.     During his interaction with Mr. Cash, Trooper Del Sordo eventually explained to Mr. Cash that he had conducted the traffic stop because the vehicle had been traveling in the left-hand lane in violation of Pennsylvania law.  Tr. 11.

---

[1]  Pennsylvania Department of Transportation Fact Sheet Reconstructed Vehicle Titling Process
https://www.dot.state.pa.us/Public/DVSPubsForms/BMV/BMV%20Fact%20Sheets/Reconstructed_Vehicles.pdf

39.     Trooper Del Sordo testified that "Mr. Cash did not object to the violation," and "at one point he had stated that I was right" about the violation.  Tr. 11; see also 34 (stating that Mr. Cash "did not deny the traffic violation").

40.     Trooper Del Sordo told Mr. Cash that he was going to give him a warning for the traffic violation.  September 26, 2018 Incident R. 4.

41.     Mr. Cash indicated that he was traveling to Philadelphia, which in Trooper Del Sordo's training and experience is a source city for narcotics intended to be distributed in the Pittsburgh area.  Tr. 14; September 26, 2018 Incident R. 5.

42.     When asked who the owner of the vehicle was, Mr. Cash stated that it was his cousin's friend's vehicle.  Tr.  14; September 26, 2018 Incident R. 5.

43.     Trooper Del Sordo did not ask Mr. Cash the name of the owner.

44.     Trooper Del Sordo assumed that Mr. Cash did not know the name of the owner based on Mr. Cash offering a description of the owner (cousin's friend) instead of providing the name of the owner.  Tr. 39.

45.     Trooper Del Sordo testified that in his training and experience, "the operators of these vehicles that have aftermarket hidden compartments are essentially in the vehicle and told to drive from point A to point B with little knowledge of where the vehicle came from or who it's registered to."  Tr. 14.

46.     When offering his answer, Mr. Cash stuttered and stammered.  Tr. 15; September 26, 2018 Incident R. 5.

47.     Trooper Del Sordo viewed Mr. Cash's response as an effort to convince the Trooper that his answers were truthful.  September 26, 2018 Incident R. 5.

8

48.     Trooper Del Sordo also based his belief that Mr. Cash was not being truthful on the above indicators and his own observations that led him to conclude that the vehicle contained an aftermarket hidden compartment.  Tr. 17.

49.     Mr. Cash told Trooper Del Sordo that his passenger was "Curt," his cousin, but he was unable to give his last name.  Tr. 19; September 26, 2018 Incident R. 4.

50.     This also raised Trooper Del Sordo's suspicion that illegal drug trafficking was being conducted.  He explained that "individuals involved in drug trafficking, [] may not know each other very well. They may have been both paid to ride in the same vehicle together. Commonly, they don't know -- sometimes they don't even know their first names. It's very typical that they wouldn't know their last names either."  Tr. 19.

51.     Trooper Del Sordo asked Mr. Saxton-Smith for identification, but he did not have one with him, but Mr. Cash provided him with his name and date of birth.  Tr. 18; September 26, 2018 Incident R. 4.

52.     Mr. Saxton-Smith told Trooper Del Sordo that he and Mr. Cash were "just out for a ride" and did not know where they were going, stating that they "would figure that out when [they] got there."  Tr. 18.

53.     Trooper Del Sordo testified that in his "training and experience, the innocent motoring public will have specific answers to these questions."  Tr. 19.

54.     Trooper Ryan Marmo, who was driving by the scene, stopped to assist. September 26, 2018 Incident R. 4.

55.     Trooper Marmo told Trooper Del Sordo that he too had a suspicion that the vehicle had a hidden compartment, and that he thought it would be found in the second-row seats.  Tr. 19-20.

56.     Trooper Del Sordo informed Mr. Cash that he was going to search the vehicle based on the odor of marijuana.  September 26, 2018 Incident R. 5.

57.     Although not stated to Mr. Cash, Trooper Del Sordo believed that he had probable cause to search the vehicle for evidence of drug trafficking based on the indicators he had observed.  Tr. 22.

58.     Trooper Del Sordo explained that he concluded that the vehicle had an after-market hidden compartment, and that he had cause to cause to search the vehicle, because there "were factors present that I observed prior to stopping that vehicle. And then there were more factors present after stopping it and speaking with the operator and the passenger. Those factors independently mean nothing; those factors in totality mean a lot."  Tr. 39.

59.     He testified that vehicles that have after-market hidden compartments are generally "five to ten years old, but they have an appearance that they are a new vehicle. Generally, these vehicles are newly registered, which you can observe that by looking at the registration plate. They're fairly plain. They want to blend in with traffic. They're not going to have any identifiers to make this vehicle stand out. They want to blend in with traffic."  Tr. 29.

60.     During the course of the search, Trooper Del Sordo, assisted by Trooper Marmo, discovered a hidden compartment in the second-row seats of the vehicle containing $16,200 in United States currency.  Tr. 22; September 26, 2018 Incident R. 5.

61.     Mr. Cash and Mr. Saxton-Smith stated that they had no knowledge of the

hidden compartment and disclaimed ownership of the currency.  September 26, 2018 Incident

R. 5.

62.     Mr. Cash and Mr. Saxton were transported to the Pennsylvania State Police

barracks at Greensburg and were then released.  September 26, 2018 Incident R. 5.


**CONCLUSIONS OF LAW**

*Traffic Stop*

1.     The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizure, shall not be violated, and no
> Warrants shall issue, but upon probable cause, supported by Oath or
> affirmation, and particularly describing the place to be searched, and the
> persons or things to be seized.

U.S. Const. Amend. IV.

2.     "The United States Supreme Court has held that stopping a car and detaining

its occupants is a seizure under the Fourth Amendment."  United States v. Johnson, 63 F.3d

242, 245 (3d Cir. 1995) (citing United States v. Hensley, 469 U.S. 221, 226 (1985).

3.     In Terry v. Ohio, the Supreme Court held that a brief investigatory warrantless

search, based on less than probable cause, is permissible under the Fourth Amendment where

a police officer has a reasonable, articulable suspicion that criminal activity is afoot.  Terry,

392 U.S. 1, 30 (1968), see also United States v. Yamba, 506 F.3d 251, 255 (3d Cir. 2007).

4.     Accordingly, "a stop to check a driver's license and registration is

constitutional when it is based on an 'articulable and reasonable suspicion that ... either the

vehicle or an occupant' has violated the law." Johnson, 63 F.3d at 245 (quoting Delaware v.

Prouse, 440 U.S. 648, 663 (1979)).

5.       Trooper Del Sordo testified that he stopped Mr. Cash because he observed the

vehicle traveling in the left-hand lane for approximately 1 and 1/2 miles in violation of 75 Pa.

Cons. Stat. § 3313(d)(1).

6.       Section 3313(d)(1) of Title 75 of the Pennsylvania Statutes states as follows:

(d) Driving in right lane.—

> (1) Except as provided in paragraph (2) and unless otherwise posted,
> upon all limited access highways having two or more lanes for traffic
> moving in the same direction, all vehicles shall be driven in the right-
> hand lanes when available for traffic except when any of the following
> conditions exist:
>
> (i) When overtaking and passing another vehicle proceeding in the
> same direction.
> (ii) When traveling at a speed greater than the traffic flow.
> (iii) When moving left to allow traffic to merge.
> (iv) When preparing for a left turn at an intersection, exit or into a
> private road or driveway when such left turn is legally permitted.

75 Pa. Cons. Stat. 3313(d)(1).

7.       Trooper Del Sordo testified that that Mr. Cash's travel in the left-hand lane was

a traffic violation because "[a]ll vehicles are required to travel in the right-hand lane unless

they are overtaking a vehicle to pass."  Tr. 10.

8.       He further testified that Mr. Cash "had ample opportunity to move over to the

right-hand lane."  Tr. 10.

9.       Mr. Saxton-Smith argues that Trooper Del Sordo did not have reasonable

suspicion to conduct the traffic stop, and therefore, moves for suppression of evidence

obtained as the fruit of the illegal traffic stop.

10.     Mr. Saxton-Smith does not allege any fact to call into question that Mr. Cash was traveling in the left-hand lane for approximately 1 and 1/2 miles.

11.     Instead, he questions whether the Trooper initiated the traffic stop based on a misunderstanding of Section 3313(d)(1).[2]

12.     He argues that Trooper Del Sordo's explanation to Mr. Cash of why he pulled him over suggests that the Trooper believed that Mr. Cash, or any driver, *always* had to stay in the right-hand-lane, even if the vehicle was lawfully passing right-lane traffic . Deft. ¶ 15 ("Trooper Del Sordo seems to be under the impression that one should travel in the right-hand lane").

13.     The argument is unavailing.  An "officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction.  As long as both

---

[2]  Mr. Saxton-Smith also contends that the phrase "limited access highway" is not clearly defined and is subject to confusion because it permits certain left hand turns from the left-hand lane on limited access highways.  ECF No. 604, at 9, ¶ 2.  To the contrary, Pennsylvania law clearly defines a "limited access highway" as a "highway in respect to which owners or occupants of abutting lands and other persons have no legal right of access except at points and in the manner determined by the authority having jurisdiction over the highway."  75 Pa. Cons. Stat. § 102.  Section 3313(d) applies only to a subset of limited access highways, defined in the statute as those "having two or more lanes for traffic moving in the same direction."  75 Pa. Cons. Stat. § 3313(d).  Pennsylvania law also provides an instructive definition of a separate subset of limited access highways; namely, a "freeway," which is defined as a "limited access highway to which the only means of ingress and egress is by interchange ramps."  75 Pa. Stat. Cons. § 102 (emphasis added).  In light of these definitions, the exception permitting certain left-hand turns provided for in 3313(d)(1)(iii) is not confusing.  The statute's provision to permit left-hand turns on certain limited access highways refers to a highway where the "authority having jurisdiction" has provided a legal right of access that includes a permissible left-hand turn, at "an intersection, exit or into a private road or driveway"  3313(d)(1)(iii).  In any event, the left-hand turn from the left-hand lane exception to Section 3313(d)(1) is not applicable in this case.

prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination."  <u>United States v. Delfin-Colina</u>, 464 F.3d 392, 399 (3d Cir. 2006).

14.     It is undisputed that Trooper Del Sordo stopped Mr. Cash because he observed him traveling in the left-hand lane for 1 and 1/2 miles.

15.     He credibly testified that he believed that such conduct was a violation of the section 3313(d)(1)'s requirement that "all vehicles shall be driven in the right-hand lanes when available for traffic."  75 Pa. Cons. Stat. § 3313(d)(1).  <u>See</u> Tr. 10, 35.  Mr. Saxton-Smith offers no contrary evidence.

16.     The Court finds that Trooper Del Sordo "possessed specific, articulable facts that [Mr. Cash] was violating a traffic law at the time of the stop," and therefore the stop of the vehicle was justified.  <u>Delfin-Colina</u>, 464 F.3d at 398.

### *Warrantless Search of the Vehicle*

17.     Even if the stop was lawful, Mr. Saxton-Smith argues that the evidence should be suppressed because Trooper Del Sordo conducted an investigation based on a hunch of unparticularized criminal activity that unlawfully prolonged the stop in an effort to search the vehicle without reasonable suspicion of criminal activity.

18.     "Until a valid warrant has issued, citizens are entitled to shield 'their persons, houses, papers, and effects,' from the government's scrutiny.  Exclusion of the evidence obtained by a warrantless search vindicates that entitlement."  <u>Hudson v. Michigan</u>, 547 U.S. 586, 593 (2006) (quoting U. S. Const. Amend. IV).

19.     "[E]vidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion".  Segura v. United States, 468 U.S. 796, 804 (1984).

20.     "The government must bear the burden of proving the existence of reasonable suspicion" to justify a warrantless search.  United States v. Coward, 296 F.3d 176 (3d Cir. 2002).

21.     A "traffic stop must be reasonably related in scope to the justification for the stop."  United States v. Johnson, 63 F.3d 242, 247 (3d Cir.1995).

22.     "To justify a greater intrusion unrelated to the traffic stop, the totality of the circumstances known to the police officer must establish reasonable suspicion or probable cause to support the intrusion."  Id.

23.     "[O]nce the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." United States v. Kennedy, No. 13-240, 2014 WL 6090409, *8 (W.D. Pa. Nov. 13, 2014) (citations and quotations omitted).

24.     The Supreme Court has "described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U. S. 411, 417-418 (1981)).

25.     The Supreme Court has described "probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."  Ornelas, 517 U.S. at 696

(citing <u>Brinegar v. United States</u>, 338 U. S. 160, 175-76 (1949) and <u>Illinois v. Gates</u>, 462 U. S. 213, 238 (1983)).

### *Smell of Marijuana*

26.     "It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause".  <u>United States v. Ramos</u>, 443 F.3d 304, 308 (3d Cir. 2006).

27.     Trooper Del Sordo's testimony that he smelled the odor of burnt marijuana was credible.

28.     Therefore, on the basis of the smell of burnt marijuana, Trooper Del Sordo possessed sufficient probable cause to search the vehicle.

### *Totality of Circumstances*

29.     "The Supreme Court has stressed that the totality of the circumstances standard enables 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'"  <u>United States v. Thompson</u>, 772 F.3d 752, 759 (3d Cir. 2014) (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002)).

30.     Reasonable suspicion is more than a hunch but less than probable cause. <u>Green</u>, 897 F.3d at 183.

31.     "In determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." <u>Terry</u>, 392 U.S. at 27.

32.     Reasonable suspicion must be evaluated under the totality of the circumstances and "'cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each.'" United States v. Green, 897 F.3d 173, 183 (3d Cir. 2018) (quoting District of Columbia v. Wesby, ---U.S. ---, 138 S. Ct. 577, 588-589 (2018)).

33.     "[I]nnocent factors taken together may appear suspicious to an experienced officer."   Terry, 392 U.S. at 22-23.   "[W]hile the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they must serve to eliminate a substantial portion of innocent travelers."   Thompson, 772 F.3d at 759 (quotation and citations omitted).

34.     Trooper Del Sordo suspected that Mr. Cash's vehicle had an aftermarket hidden compartment before he effectuated the traffic stop.

35.     Trooper Del Sordo credibly testified that his suspicions were based on his training and experience in recognizing the characteristics of cars that have aftermarket hidden compartments.

36.     Such vehicles are five to ten years old but have an appearance of a new vehicle, they are newly registered, as can be observed by the registration plate, they are plain without identifiers to make the vehicle standout in traffic.  Tr. 29-30.

37.     Trooper Del Sordo observed the vehicle's registration plates.  Through use of a an in-car computer check, before he initiated the stop, he discovered that the vehicle was registered to a location in Philadelphia.  Tr. 13, 30.  Trooper Del Sordo testified that Philadelphia is a known source city for narcotics.

38.     Trooper Del Sordo initiated the traffic stop already suspecting that the vehicle may contain an aftermarket hidden compartment.

39.     During questioning, Trooper Del Soro's suspicions that there was criminal activity afoot were raised.  He had observed the vehicle's appearance that it might contain aftermarket hidden compartment, he smelled the odor of burnt marijuana, he observed a single key on a key chain as opposed to several keys, he learned that the vehicle was traveling from a known narcotics distribution city heading to a known narcotic source city, Mr. Cash displayed behavior indicating that he was not telling the truth about his passenger or the true owner of the car, and Mr. Saxton-Smith's explanation of where they were going did not match Mr. Cash's.

40.     In effectuating the traffic stop and searching the vehicle, Trooper Del Sordo relied on his observation, based on his training and experience, that the vehicle had several indicators suggesting that it contained an aftermarket hidden compartment.  Further, Trooper Del Sordo testified that in his training and experience aftermarket hidden compartments are used for one thing: to conceal illegal contraband.

41.     Independent of the smell of marijuana, Trooper Del Sordo had made observations and learned information that, based on his training and experience, demonstrated that in light of the totality of the circumstances, criminal activity may be afoot, thereby justifying the search of the vehicle.

42.     Trooper Del Sordo indicated he was going to search the vehicle based on the smell of burnt marijuana, but in fact Trooper Del Sordo possessed separate specific, articulable reasons that criminal activity was afoot to justify the vehicle search.

18

43.     The Court concludes that Trooper Del Sordo had articulable, reasonable suspicion to suspect that criminal activity was afoot at the time he decided to search the vehicle.

44.     The Court observed the direct and cross-examination testimony of Trooper Del Sordo, reviewed the transcript, Dash Cam Video of the stop, and the Police Incident Report. Although Trooper Del Sordo's first observations of the vehicle led him to suspect that it had an aftermarket hidden compartment, he thereafter proceeded cautiously by questioning the occupants and making observations that, in there totality, confirmed his initial suspicion of the existence of an aftermarket hidden compartment.

45.     The Court finds that the steps taken by Trooper Del Sordo to further investigate his suspicion of criminal activity were reasonable activities that contributed to the length of the stop, and therefore the length of this stop was not unreasonable in light of the totality of the circumstances.

46.      With respect to the search of the hidden compartment, based on his training and experience with respect to vehicles with aftermarket hidden compartments, his observations of this specific vehicle, and his observations during questioning of the occupants, Trooper Del Sordo had probable cause to search for, and then open, the aftermarket hidden compartment to look for contraband.  See United States v. Terry, No. 3:18-CR-24, 2019 WL 2176330, *24 (W.D. Pa. May 20, 2019).

47.     Mr. Saxton-Smith argues that before the traffic stop was initiated Trooper Del Sordo had already decided he was going to search the vehicle for an aftermarket hidden compartment, and such was his reason for conducting the search.

48.     The Court concludes that despite his initial observation, Trooper Del Sordo had not predetermined that the occupants were engaged in criminal activity but rather he appeared to have acted based on the events as they unfolded as he worked to dispel or confirm his suspicions.

49.     Mr. Saxton-Smith challenges whether the government has submitted sufficient evidence to permit the Court to find that Trooper Del Sordo possessed the necessary training and experience credentials as of the date of the traffic stop on September 26, 2018.

50.     Trooper Del Sordo's testimony was clear as to the type of training he received and when he received it.  Such training was undergone well before the stop in this case occurred.

51.     As to his personal experience with aftermarket hidden compartments, he credibly testified that he had personally been involved with a number of such instances prior to the stop in this case, that he had observed eight to ten hidden compartments during his training,  and thereafter that he been a part of traffic stops with other TACET members and troopers in which said law enforcement had seized hidden compartments.

52.     Trooper Del Sordo possessed the necessary training and experience to support his conduct in stopping and searching the vehicle on September 26, 2018.

## CONCLUSION

1.      The initial traffic stop of Mr. Cash's vehicle was justified based on Trooper

Del Sordo's observation of a traffic violation.

2.      The length of the traffic stop was reasonable due to Trooper Del Sordo's

investigation to either confirm or dispel his suspicion that the vehicle contained an aftermarket

hidden compartment and that criminal activity was occurring.

3.      Trooper Del Sordo possessed probable cause to search the vehicle without a

warrant.

4.      There was no Fourth Amendment violation and therefore no basis on which to

suppress any evidence.

## ORDER

AND NOW, this 20th day of May 2021, based on the above Findings and

Conclusions, it is hereby ORDERED that Defendant's Motion to Suppress, ECF No. 439, is

DENIED.

BY THE COURT:

Marilyn J. Horan
United States District Judge